Here ye, here ye, His Honorable Appellate Court for the Second Judicial District is now back in session. The Honorable Robert E. McLaren presiding. Please be seated. Your Honor, the final case on the docket this morning, 22-0415, People of the State of Illinois, defendant Appellee v. Robert Barwicki, defendant Allen. Arguing on behalf of the attorney, Mr. Elliot Borchardt. Arguing on behalf of Appellee, Mr. Richard S. Lundy. Mr. Borchardt, you may proceed. Thank you, Your Honor. Can I? Yes. Good morning, Your Honors. Morning. Morning, Counsel. I'm Elliot Borchardt. I'm from the Office of the State Appellate Defender. I represent the defendant appellant, Mr. Robert Barwicki, in this case. May it please the Court. To prove Mr. Barwicki guilty at trial of domestic battery, the State sought to prove that Mr. Barwicki was family or household members with Alyssa because they shared a common dwelling. However, the evidence at trial merely established that Alyssa was nothing more than Matthew's boyfriend and they both lived alone in the basement, a separate unit, if you will, of that house. The same house, correct? Yes, it is the same house. And how did she get into the basement? So my understanding is that there was a, she went through the garage and then probably through some hallways to get to the basement. At the end of the day, I don't think that necessarily means that they shared a common dwelling. However, if you think about an apartment context, I mean an apartment building, there are typically common hallways to get to the particular units. I would submit that this is just like that. I didn't see anything on it, but did they pay rent? Matthew and Alyssa? That I don't know. I don't think that's in the record, Your Honor. I didn't see that either. So I'm not sure. So what the record established was that Alyssa and Matt were their boyfriend and girlfriend. They stayed in the lower level of this apartment. But the statute requires more for them to be family or household members. The family or household member definition, yes, is designed to be broad. It's supposed to capture a myriad of different types of relationships. However, when it comes to a common dwelling, there still needs to be some sort of shared living arrangement or cohabitation. And that's something that's simply missing here. If she and he lived upstairs in one of the bedrooms, would your argument be different or would it be the same? Alyssa and Matt, if they lived upstairs? Yes. I think it would depend on the circumstances. It might be a little different if I'm going to be completely honest with you, Your Honor. Part of the reason for that is because here we have a situation where we have in the basement all sorts of different things that you would expect to find in a distinct living area. So you have the living room, you have the bedroom, you have the bathroom, so on and so forth. Whereas if you're living upstairs, I mean, you just have a bedroom there, right? You're sharing everything. Right, right. But that doesn't seem to be the case here, Your Honor. So to answer your question, it probably would change the analysis a little bit. But, excuse me, what we have here, Your Honor, is we know that Alyssa, she doesn't spend a whole lot of time upstairs at any at all. We know she doesn't have a lot of contact with Mr. Barwicky, given Mr. Barwicky testified that he didn't even know Alyssa very well. And also, you know, just because they happen to sleep under the same roof, I don't think necessarily means that they share a common dwelling. The criminal code, the legislature does define dwelling in a criminal code. And it is defined. Counsel, you're talking about a dwelling, and I don't know that a dwelling is necessarily what a household is. I was under the impression with all my years that a household meant the people in the dwelling were members of the household. They weren't members of the dwelling. So could you narrow or clarify or focus on the terminology that's in the statute that relates to members of a household, et cetera? Sir, I just want to make sure I'm following you here, Your Honor. Well, the point is you're arguing something that's somewhat esoteric, if not arcane, relating to a structure and attempting to distinguish how near or far, how connected, interconnected, or not interconnected, people are based upon where they sleep in a dwelling. And that isn't what we're supposed to be reviewing. We're supposed to be reviewing whether or not they're a member of the household. Right. And those who share a common dwelling, they are family or household members. But Mr. Barwicky's position is that they didn't share a household. There are two different distinct households here. We have something upstairs with the first and second floors, and we have something downstairs in the basement where Matt and Alyssa lived. So the argument is that those are two distinct dwellings, if you will. Well, if that's the case and the defendant was convicted, then the standard on review is manifest way to the evidence in order to establish that the element relating to what we're now discussing wasn't proved beyond reasonable doubt. So what is it that you think the manifest way to the evidence establishes that they aren't members of the same household? So I think the evidence clearly established that Alyssa and Matt lived alone in the basement. That, I think, is crystal clear based on what Alyssa testified to. She testified, hey, it's just me and Matt who live in the basement. So they're household members. Others are not. Yeah. So Matt and Alyssa are definitely family or household members. Not only because they definitely share a common dwelling, but they also follow within the statute because they're boyfriend and girlfriend. They had that dating relationship. So I think those two were family and household members as their own. Now, you state filed a motion to cite additional authority, a case that came out of the second, Keeper v. Brown III. How do you distinguish that case if you need to distinguish it? Yes. So happily, Your Honor, that case presents a completely different question. That case, you know, the way I read how this Court handled that case is it was generally presumed that, you know, we're dealing with one household. The question is whether the complainant actually lived there. And then there's testimony that, you know, she did testify that she lived there. She had a bedroom there and she had been living there for a few weeks at that point. So really the question there is did she live there? Here the question is, okay, what's the scope of this dwelling here? And given the scope, were Mr. Barwicky and Alyssa family or household members? So I think that's the difference in that case. Excuse me. I just want to back up on the structure here. So are you saying that there was no common means of ingress and egress between what you're saying is Barwicky's residence and the basement? I thought the staircase connected the two of them. So, yes, there is one staircase that leads upstairs and down. There's only one way to get to the basement. And that staircase, I think there was some testimony about, you know, the window. You could go through the window, but that's probably not reasonable. But, yes, that staircase is the only way up and down to the basement. But she got there through the garage. She had the code for it. Correct. And then she came through the family room to the staircase and went down. I'm not exactly sure where the staircase was in relation to the house. I think the testimony was that it was somewhere in the middle of the house. But, again, just because that's shared common space doesn't mean that they should share the common dwelling. Again, I go back to the apartment example where you walk into the building, you have this common hallway to get to the separate units as well. I do want to just briefly touch on some of these Alma factors, or specifically one of them that courts have used to determine whether people are family or household members, specifically, you know, the personal items at the residence. So, Alyssa did testify that she had toothbrushes there, some hair care products, clothes, all sorts of belongings there. But I want to stress that that's in the basement. And, again, it's a separate dwelling. The factor specifically is whether they kept personal items at a shared residence. So she shared that residence with Matt. Again, so they're family or household members, not only for that reason, but because they're boyfriend and girlfriend. Well, Mom came down there to do laundry, right? Correct, she did. But that was Mom. That wasn't Mr. Barwicky. Wait, but if you're going to say Mom is a household member because she came down and used the basement, Mr. Barwicky is not because he didn't use the basement? So I also would argue that Mom was not a family or household member, too. I would also submit that the laundry area is also a common piece. I could speak from personal experience when I was in law school. I lived in an apartment building with 12 units. Everybody had their own unit. I had my living room, family room, kitchen, what have you. But there's one laundry room that everybody in the building used. So there's two washers in there, two dryers in there, and everybody used those who lived in the building. Now, just because I used the same washer and dryers, everybody, I wouldn't consider myself living with the other people in the apartment building. Well, you also had a key to your own apartment, as did everyone else's. You'd have a separate lease and all of that, and you would only have one means of coming and going. People wouldn't be able to simply walk into your apartment unit. Correct. That's absolutely correct. But here, I mean, Barwicky could have walked right down there and did, during this incident, walk down the stairs. He did. But the implicit, I guess the inference from the testimony is that really didn't happen often, if at all. It did happen on this one occasion. But given that Mr. Barwicky didn't even know Alyssa, I mean, he testified that he didn't really follow them around or check in on them. He didn't even know that they were staying in the basement. He thought it was just going to be a one-time sleepover type situation. So just based off that, I think we can infer that he didn't really go down there to the basement that often. So I do want to switch gears here a little bit and talk a little bit about the other issue, which is actually the first issue in the brief, this hospital behavior and the evidence of that. So Mr. Barwicky was on trial for three things, battering Alyssa, battering Matthew, and for criminal damage to property. What happened at the hospital, whether Mr. Barwicky was belligerent at the hospital, had absolutely nothing to do with what happened with regard to the incident he was charged for. So you bring that up two ways, ineffectiveness as well as error. Correct, clean error. Okay. That is correct. Counsel, he was charged with two offenses, was he not? At least two, domestic battery and damage to a vehicle. Yes, so there was a domestic battery to Alyssa. When did the damage to the vehicle take place? Did it take place before the first hospital episode or did it happen at the second hospital? So the damage to property occurred between hospital visits. Okay, so you think it's not relevant or material to discuss whether or not this person's mental state was aggressive or belligerent or destructive, is inappropriately established by talking about what happened before and what happened after his criminal act relating to the damage to the car? Correct. I would actually argue that it's not state-of-mind evidence. It's propensity evidence. So Mr. Barwicky, based on the testimony at trial for Matt and Alyssa, was angry and upset. So we have that. We have the piece of him being upset during the actual incident that the jury could consider. This piece about what happened at the hospitals had no bearing on that whatsoever. Wait a second. You're talking about propensity and I'm talking about state of mind and the question of whether or not it was an accident, that he just happened by accident to kick the window askew. So let's forget propensity because I don't think kicking a window necessarily is correlative to being belligerent in any other setting. But what about the state of mind or motive or accident or lack of accident? Why wouldn't that be relevant? Because it's within about as close proximity in time as you can get without being in the actual transaction. So with regards to what actually happened in the car, so the video already establishes that Mr. Barwicky is angry. So what happened at the hospital isn't necessary for that. I'm not going to stand before the honors and deny that Mr. Barwicky is angry in that video. He obviously is. You never alleged that it was a mistake that he broke the window. No, I don't think that was alleged at trial. We're not arguing that here on appeal either. I think based on that video, I can't in good faith argue it was a mistake. But based on him being angry already, based on what we see in that video, that just further reduces any probative value that the hospital behavior has. Even if there was error in admitting that, how is it prejudicial? So I think it goes to basically first primary, at least with regards to the domestic case especially. It kind of ties hand in hand with the strictly prejudiced aspect too. It's prejudicial, especially because I think this is the last thing, for several reasons, but most importantly, I think this is the last thing the jury heard before it went back and deliberated. The state says, hey, look at this hospital behavior. Nobody would like Mr. Barwicky based on that hospital behavior. Now find him guilty based on, in part, what happened at the hospital. That's the very last thing the jury heard. It's its last impression of the case before it goes back and deliberates. And it, of course, did find Mr. Barwicky guilty of some of the offenses. You know, I think also striking here with regards to first round plain error, Your Honor, is Mr. Barwicky was also acquitted of some of the offenses, especially with regards to domestic battery to Matt. So the jury's already not entirely believing that in Alyssa's testimony, given its credibility to find findings necessary from that finding of not guilty. There are also, you know, several inconsistencies between Matt and Alyssa's testimony as well that I lay out through the brief, I mean, just to briefly cover them here, just ranging from whether, excuse me, you know. There's some water there if you need it. It's okay, Your Honor. So, yes, there are some inconsistencies ranging from whether, you know, Matt jumped on Mr. Barwicky before or after the cell phone was taken, whether Matt was aggressive from, because Alyssa testified that, you know, he jumped on Mr. Barwicky before the cell phone incident occurred and that he wanted to, quote, take care of this or something along those lines. That was, what is the standard of review for us to reverse that jury verdict? So because it's through the lens of ineffective assistance of counsel and plain error, the standard of review would be, at that point, a no vote based on the case law. If what you say is true and the jury was affected and your client was prejudiced, why wouldn't they have found him guilty of battering the male? Your Honor, obviously we don't know what goes on during jury deliberations. What I can glean just based on the jury deliberations is that it was at least close, given that, you know, they split the baby, for lack of better words. Do you think the jury might have decided that it was mutual combat between the two males? I think that's certainly within the realm of possibility. The evidence, you know, could potentially support that. No more questions?  Thank you, Your Honors. Thank you. You have an opportunity to make rebuttal. Mr. London, you may proceed. Mr. London, how is that not error, plain error, to put all of that evidence in? Your Honor, it wasn't plain error for a couple of reasons. One, it really was admissible. It certainly was admissible for the first hospital because it did go to defendant's state of mind. It went to defendant's state of mind, certainly relating to the conduct in the automobile, number one. Number two, contrary to defendant's position, the evidence relating to both the damage to the property and the domestic battery of Alyssa was not closely balanced. Why not? Why not? I mean, it was certainly it was the purview of the jury to make that determination who was telling the truth, correct? Of course. And in this case, we actually posit that we had a very sophisticated jury. The jury differentiated between the conduct between defendant and his stepson and defendant and Alyssa. Whether it was mutual combat situation or whether it was possibly closely balanced as to those two, why is there a difference? Why is it not closely balanced? Because we didn't have just the testimony of Alyssa and Matthew and defendant. We also have the very important testimony of defendant's minor son, Arby, who, again, while it's speculative, it probably is likely. He didn't see everything. He didn't see everything, so he did not testify that he saw anything relating to Matt and defendant. So that is a darn good reason why the jury could have believed, whether it was mutual combat or some other reason, that the evidence was closely balanced that they gave defendant the benefit of the doubt relating to the conduct or the charge to Matt. However, Arby testified that he definitely saw the conduct related to Alyssa. And he testified that he saw, one, defendant blocking the stairway, not allowing either Matt or Alyssa to exit the basement, which, again, while speculative, if they had been able to leave, none of the conduct with Alyssa may have occurred. Two, more importantly, he specifically testified, he, Arby, that he saw defendant push and or hit Alyssa. And he then saw her head. He heard that. Well, he saw her head move. He then did not see because of the angle. He did not actually see her face hit the bookcase. But he, after he saw the push or slap, then saw her head move and then heard her head contact. So that is significantly stronger than the two and would explain the difference. So I would say that the evidence is the opposite. It shows that this jury was very sophisticated and did not allow the testimony, even if this court were to find that that was error. Did not allow it. It certainly was not extraordinarily prejudicial. What about in combination? So obviously the behavior at the first hospital you're saying relates to the conduct in the car. The second hospital behavior. Second hospital behavior still could arguably go and, you know, the people argue, goes to his state of mind in general that he was angry and upset and that conduct in that state of mind was ongoing. But to be honest, even if this court were to find that there shouldn't have been testimony allowed at that time, at least not in direct on the people's case in chief, that most likely could have come in in rebuttal after defendant testified and argued that one, Matthew and or Alyssa hated him, if not at least severely disliked him, that he was calm, that he was the victim, that he claimed he didn't do any of the conduct, even though that was disputed and rebutted by his own son. So that could have come in on rebuttal. But again, more importantly, it's just simply not prejudicial, even if this court were to find that. Was there any diagnosis at either hospital about what his injuries were? Well, there wasn't because he apparently was never admitted to either because of his conduct. But we do have testimony of a police officer, which, as I said, would arguably have come in rebuttal, even if not the case in chief, that he refused and didn't need a cervical collar, that despite him claiming that his leg was paralyzed or testifying that his leg was paralyzed or possibly broken, that he was able to readily walk on his own in and out of the police car. So there wasn't a diagnosis, but there was certainly evidence that he was not injured. What's your argument about the issue relating to being members of the household? Your Honor, this isn't an apartment building. This is not a shelter. There is implications raised during argument that this was a completely separate living circumstance. There's no testimony to that extent. The testimony is that Alyssa and Matthew lived in the basement, but there was no testimony relating to whether or not they accessed upstairs. There also isn't testimony or evidence that Alyssa solely entered the house through the garage. She entered the house through the garage at least some of the time, and she had the garage code implying that she's more than just a visitor. But there was also at least an implication that she could have or may have, well, also entered through the front. The mom regularly did laundry in the basement. The kids played and went down to the basement. Again, there was no testimony from either of the children. Mom didn't testify at all. R.B. didn't testify relating to how often he was or was not in the basement. There's no testimony that Alyssa and or Matthew didn't access the kitchen. And while there was a bathroom and bedroom, there wasn't a kitchen facility. Part of the issue the day before supposedly related to whether or not the two of them, Alyssa and Matt, you know, ordered food late at night. But I don't think you can get from that that that means that they didn't eat in the kitchen at other times. And to be honest, and I'm sure this was a factor for the jury to consider, defendant's testimony that he didn't know Alyssa, he barely, you know, didn't follow them, didn't care, and or he thought that she was there for a night, that's totally incredible. It's incredible not just based on the testimony, again, of Matthew and Alyssa, who testified that she was there at least six, possibly as long as 12 months. But again, the testimony of R.B., who said she had been, she lived there, she was there every night. And when we look at testimony of the other factors, she didn't keep some clothes there. The testimony was all her clothes were there. All of her personal belongings were there. All of her makeup, her hair products. Well, her cat wasn't there. Her cat wasn't there. Do you consider her a cat, a pet, a personal belonging? Personally, I consider her a cat. Because I like cats. Personally, I consider, I love cats, I have cats, I consider cats part of the family. I don't know if I would go and move in anywhere if they didn't let me bring my cats. I don't know her circumstances. So it's very possibly someone in the household was allergic. For whatever reason, the cats weren't there. And she did say that she visited occasionally. The only factor really against her living there, or being a member of the household, was she didn't get the mail there. But she did testify that she got, and again, this is a different era. How much stale mail do we get? We get more packages and deliveries. And she testified that all her packages and deliveries were sent there. So there's little or no dispute that she lived there, she dwelled there, that she was a household member with mom and or the kids. And can Mr. Barwicky say, well, I don't go downstairs, or I allegedly never went downstairs? I guess he could. But if everyone else in the family is a household member with Alyssa, is he not? And again, we really didn't have testimony, even from Mr. Barwicky, that I never went downstairs. His claim, like I said, that he didn't know Alyssa, it's totally incredible based on the testimony of his own son. You can't pick your in-laws, right? Well, to say the least. I mean, you can't pick your in-laws, you can't pick your stepchildren's boyfriends or girlfriends. And the people also disagree with defendants' analysis of Brown. Brown, the case that we cited for leave to cite for additional authority. In Brown, it wasn't simply who was a member of the dwelling who lived there. The implication was that defendant was merely a working person, a work person. So if you're saying a work person who's in a room, that that is more of a household member than a girlfriend who's been living there six months to a year. And the testimony was unclear in that case how long they had dwelled together. It could have been as little as two weeks. It could have been as long as two months. And there was even testimony, unlike this case, that the victim in Brown didn't necessarily exclusively live in the house. She may have also had another house, but she at least lived or dwelled there part of the time for two months or two weeks. It could be since it was two weeks before the offense, the implication is strong that they dwelled together for only two weeks. And yet this court found that that was sufficient to establish. It's clear that the whole concept of the statute and the legislature intends to protect people, both family members and people dwelling or living together, whether they're in-laws, whether they're, you know, people living there. Counsel, I have a question on the prejudice issue concerning the behavior at the second hospital. So in the closing argument, the prosecutor sums up with the control theme says, quote, based on that, based on his anger, based on what you saw on the videotape, based on what you heard, his actions were before, during, and after. We ask you to find him guilty of all the charges. Why isn't that inflammatory, especially, or does it overemphasize the continuum of the behavior well after what's being charged here? Again, Your Honor, if it goes to state of mind, it certainly could and appropriately should have come in rebuttal, even if not in the case in chief, number one. Number two, this was, I don't want to say invited error because we don't concede that it's error, but it was certainly invited by the defendant's closing argument. Defendant's closing argument was that defendant was, again, innocent, was injured, was calm throughout the whole thing, maybe raised his voice a little bit after he was attacked and or the voices were raised for Tim, but that he was calm and had no problem with Alyssa or his stepson. He merely wanted to separate his stepson from Alyssa so he can discuss certain matters with the stepson. But they went on then and said that Alyssa and Matthew were angry. They hated defendant. They didn't like him. Their conduct was, you know, again, they were the aggressors and not the attackers. So in light of that argument, it was not inappropriate for the people to give the closing they did. Yeah, but that was after he was in the basement. Correct, but it still goes to the state. It certainly goes to the state of mind prior to, for the first hospital. For the criminal damage. For the criminal damage. It arguably also goes to the fact that his state of mind was, this is, we're not talking about a day later. We're talking about within an hour or so. He still, you know, riled up. He supposedly, and again, I know if we didn't allow it or it wasn't admissible, we wouldn't have heard it. But, you know, he threw the cervical collar down. So his state of mind was still angry, you know, this entire time. Does that go to, does that rebut the argument the defendant was making? Then people would say yes. But again, more importantly, even if it was error to admit, even if the closing argument, you know, went. This is far from egregious. These statements at issue are relatively mild. This was not something where they're saying, you know, defendant was destroyed. They basically said he was upset and the hospital asked him to leave. This wasn't that inflammatory. The argument of the prosecutor wasn't that inflammatory. How do we know? May I just finish? We know that most specifically because, again, the sophisticated jury found him, acquitted him of the count relating to his steps on Matthew. And only found him guilty of the criminal damage to property, which evidence is overwhelming. And the injury to Alyssa, which, again, I would posit that the strongest evidence of that was not necessarily Alyssa or Matthew or defendant. But, again, was R.B. who specifically testified of the behavior he witnessed. Any questions? No further. Thank you. Thank you. Thank you, Your Honor. Mr. Borchardt, you may proceed with rebuttal. Thank you, Your Honor. First off, I'm glad we're on the record that cats are family. Makes me feel a little better about myself. I'm sorry, say that again. I'm just glad we're on the record that cats are family. That makes me feel better about myself. Well, I didn't weigh in on that. Yeah. I wanted you to provide for me. Your Honor, I want to start off by arguing by no means did defense counsel during closing argument invite the state's closing argument. What the defense argued was Alyssa and Matt did not like Mr. Barwicky. And that was based on evidence that they both testified to that. And that was proper evidence because that goes to their bias and motive to testify against Mr. Barwicky. However, what the state did is they didn't just limit it to Matt and Alyssa. What they did is said, well, nobody would like Mr. Barwicky. Look at this hospital behavior. So nobody should like him. And that evidence compared to the evidence of Matt and Alyssa not liking Mr. Barwicky, which was admissible, this evidence that the state used was not admissible. So there's, I think, a key difference there. With regards to, you know, X, Y, and Z not being established at trial, that ultimately falls upon the state. It is the state's burden to prove Mr. Barwicky guilty beyond a reasonable doubt at trial. So to the extent that certain things weren't established about whether, you know, they went upstairs or so on, that ultimately falls on the state. And I wouldn't know. And what is our burden at that point to reverse the jury? So that goes to the family or household element. That's a reasonable doubt argument. So this court does have to look at the evidence in the light most favorable to the state. However, that evidence is completely absent. With regards to Mr. Barwicky's son testimony, I would argue that it actually conflicts with Alyssa's and Matt's testimony as well. As your Honor pointed out, I think it's clear that Mr. Barwicky's son did not see the full event here. By the time he looked downstairs, Mr. Barwicky was already on the stairs. But one key distinction between Alyssa and Matt's testimony and Mr. Barwicky's son's testimony is with this phone. Right? So Alyssa and Matt testify that this phone comes into play. Mr. Barwicky takes this phone during this initial scuffle, whoever started it notwithstanding. But what Mr. Barwicky's son testified is that as Mr. Barwicky is on the stairs, remember that's when Mr. Barwicky's son comes into this, is by the time Mr. Barwicky is on the stairs. At that time, that's when Alyssa pulls her phone out, and according to Mr. Barwicky's son, that's when the phone gets involved and gets slapped. So there is some inconsistency there as well, I would argue as well. And finally, Your Honors, again, I really, really do not believe this is state-of-mind evidence. Instead, it's propensity evidence. What the state argued below and what it's arguing now is that, look, he was upset at the hospital, so he must have been upset during these incidents, whether that be the domestic incidents or the incident in the squad car. That's propensity evidence. You can't say just because someone acted a certain way at this one point in time means that they acted that same way a different time. Are you saying that there was only one purpose for this, the evidence to be admitted, and that was for propensity? I believe the reason the evidence was admitted was to – No, I didn't say that. I didn't answer that. Okay. The question is, is there more than one reason why a judge could exercise his discretion or her discretion and admit the testimony into evidence for various and sundry reasons, or is it only admissible for one reason, which is propensity? So I want to make sure I'm understanding Your Honor correctly. Stop me if I'm not answering your question. But a judge could admit evidence as long as it's admissible for one reason. I mean, it still has to, of course, do the balancing effect under Rule 403. But as long as it's admissible for one reason, then, yeah, it should be admissible. Let's assume for the moment that this is admissible to establish state of mind or lack of accident or mistake. If you believe or if the attorney had believed that this was admissible as propensity evidence, shouldn't he have objected and asked for a limiting instruction by the judge relative to what the purpose of this evidence is being admitted for? So, yeah, if the defense counsel thought that this was improper propensity evidence, then, yeah, he absolutely should have objected, and there should have been some sort of discussion with the court about the purpose of the evidence at that point. You're raising plain error. Correct. Right. We're raising plain error and ineffective assistance at counsel because counsel did not do that. So if there are no further questions, Mr. Berwick, we respectfully request that this court reverse and remand for a new trial, but otherwise reverse or rather his conviction for domestic battery, reduce that to a battery. Thank you, Your Honors. Thank you. Any other questions? Thank you. We will take the case under advisement. We have no further cases on the call. Court is adjourned.